IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. PX-19-518 |
| | * | |
| LACHANN ALEXIS GREEN, | * | |
| | * | |
| Defendant | * | |
| | * | |
| ******* | | |

## UNITED STATES' SENTENCING MEMORANDUM

The United States submits this Sentencing Memorandum in connection with the sentencing of Lachann Green. The United States requests that the Court sentence Green to a term of imprisonment of 30 months. This sentence, the midpoint of her guideline range, appropriately reflects the nature of Green's 15-month scheme to defraud, characterized by her enlistment of others to increase her profits and use of those profits to fund a lavish lifestyle at the expense of her employer (Business 1). The United States further requests that the Court find that Business 1's actual losses from Green's scheme for purposes of the guidelines calculations totaled $386,691.09 and order restitution for the full amount. In the plea agreement, the parties agreed to entry of a restitution order for the full amount of the losses to Business 1, which were "at least" $285,703.09, with any additional amount to be determined at sentencing. The United States submits that the additional loss under the guidelines, and for the restitution order, is $100,988.

**I.      FACTUAL AND PROCEDURAL BACKGROUND**

On November 4, 2019, Green was indicted on five counts of wire fraud, in violation of 18 U.S.C. § 1343. ECF No. 1 (Indictment). On February 10, 2021, Green pled guilty to Count 1, based on executing a wire transmission on October 27, 2017, as part of a scheme to defraud. Green operated the scheme while employed as general manager of Business 1's Rhode Island Row

residential apartment complex, a position she held from September 1, 2017, until December 18, 2018. ECF No. 46 (Plea) at 10. Entrusted by her managerial role to approve expenses and lease terms, Green instead used her position to defraud Business 1 and spent the profits from her scheme to fund a luxury lifestyle. Plea at 10-11.

    A.    *Proceeds and Loss Attributable to Scheme to Defraud*

During her employment, Green caused actual losses of $386,691.09 to Business 1, which can be grouped into three broad categories:

| Description of Fraud | Actual Losses |
|---|---|
| (1) Fake invoices | $246,179.09 |
| (2) Preferential Lease Terms to Relatives | $39,524.00 |
| (3) Fraudulent (Excess and Fake) Charges from Contractor 1 | $100,988.00 |
| **Total** | **$386,691.09** |

For the first two categories, the parties previously agreed that Business 1's losses included "at least" this full $285,703.09 amount, while leaving open the issue of whether the actual loss encompassed additional amounts. Plea ¶ 16. It does. The actual loss to Business 1 includes $100,988 from the third category of fraudulent charges from Contractor 1, as discussed below.

    1.    <u>Fake Invoices Leading to $246,179.09 Loss</u>

Green billed Business 1 for $246,179.09 in fake expenses through two methods: by submitting invoices for payment to a shell company she controlled and for direct reimbursement.

First, Business 1 paid $231,802 to a shell company controlled by Green. Plea at 10. One month after becoming general manager, on October 4, 2017, Green registered a fraudulent shell company, Executive Property Staffing ("EPS"), in Maryland. Plea at 10. She then forged a W-9 form so that Business 1's vendor payment system could process payments to EPS. *Id.* Subsequently, EPS submitted invoices—which Business 1 paid—for $231,802 in services never

2

performed, spread over 45 different installments.[1] Exhibit ("Ex.") A (Business 1 Payments to EPS).[2] Business 1 paid EPS at a bank account Green had set up in EPS's name but which she controlled. Plea at 10.

Second, Green received direct reimbursement for at least $14,377.09 in other fake expenses, which she falsely claimed to have paid out of pocket. Plea at 10. Green submitted six invoices ranging from $475 to $7,400 for vendor services at events for Rhode Island Row residents. *See* Ex. B (Invoice Summary); Ex. C (Invoices). All invoices had been created by Green and were fake. Plea at 11. Green submitted a seventh invoice, for $1,500, but Business 1 discovered Green's fraud before issuing payment. Ex. B. Even after her fraud was discovered and Business 1 terminated her, Business 1 reported that Green continued to demand reimbursement of expenses, including for the fake invoice. Ex. D (Victim Impact Statement).

Her scheme required multiple steps to conceal detection. Using her own computer, Green generated invoices that related to real events, in the name of real companies. Plea at 10. In October 2018, for example, she generated a $1,500 invoice for a Halloween party. *Id.* at 11. Although in the name of a real company, the vendor's name was misspelled, and Business 1 later discovered Green had asked a relative—not the caterer—to provide pizza for this Halloween party. *Id.* In another instance, Green submitted a vendor invoice for $4,700 to cater a holiday party, before submitting an amended invoice for the same event for $7,400. Ex. C at 2, 4. Business 1 reimbursed

---

[1] As shown in Exhibit A, EPS received payments from Business 1 by check and wire. A processing fee was charged for wire payments, making the amount that Business paid (the *proceeds* of the scheme) higher than the amount received by EPS's bank account (the *profit* from the scheme). The parties agreed to forfeiture of the entire proceeds. Plea at 6.

[2] The exhibits are being filed under seal to protect personal identifying information and confidential business and personal information related to the victim and third parties to this prosecution.

Green for the full $7,400. Plea at 11; Ex. B. The vendor, however, had not provided catering for a holiday event, and the invoice was fake. Plea at 11.

Other evidence suggests that losses from Green's conduct may have been much higher than $246,179.09 that can be calculated with certainty. Between October 2017 and October 2018, Business 1 reported that Green filed expense reports requesting reimbursement of $35,152.44, a much higher amount than the $14,377.09 it could prove through invoices to be fraudulent. Most of this total came from smaller purchases, for which Green did not need to submit an invoice that could be subjected to later analysis. Green also had authority to purchase gift cards free from recordkeeping requirements that would allow confirmation of whether she gave the gift cards to others or kept them to enrich herself. During Green's tenure, Business 1 calculated that Green made gift card purchases during her tenure that were $16,189 more than the gift card purchases during a similar time period before her tenure. *See* Ex. E (Proof of Loss).

        2.        <u>Preferential Lease Terms Leading to $39,524 in Loss</u>

As the employee responsible for setting lease terms, Green leased two apartments to relatives at below-market rates not available to the public that caused $39,524 in actual losses to Business 1. Plea at 10-11. Her relatives used fictitious names on the leases and lied about their identities to other Business 1 employees and residents to conceal Green's scheme. As a result of the below-market rent, Business 1 lost $39,524 of uncollected rent based on the rent terms that did not reflect fair market value and were instead procured through fraud for Green's relatives.

        3.        <u>Fraudulent Charges by Contractor 1 Leading to $100,988 Loss</u>

Between September 2017 and December 2018, Green submitted nearly $190,000 in invoices from a contracting business ("Contractor 1") owned by one of Green's personal associates ("Individual 1"), without Green disclosing her relationship to Individual 1 to Business 1's

4

headquarters. Plea at 11. Based on analysis of Contractor 1's invoices, these invoices included $100,988 in fake and excess charges. Ex. F (Affidavit) ¶ 6.

As general manager, Green controlled who received service contracts and approved and submitted all vendor invoices. Plea at 10. Another employee – the service manager – called the vendors Green selected at the time services were needed. Ex. F ¶ 7. Green informed the service manager that Contractor 1 should be used for all apartment turnover services, which included services such as painting and cleaning of apartments during the turnover of an apartment to a new tenant. *Id.* ¶ 3. The service manager stated that Contractor 1 had a limited scope of work, which did not include larger maintenance or repair services such as gate repair, welding, or HVAC work. *Id.* ¶ 8. Despite Contractor 1's limited scope of work, Green submitted invoices on behalf of Contractor 1 for $82,838 for services the service manager attested he never asked Contractor 1 to perform. *Id.* ¶¶ 9-10.

For services Contractor 1 did perform, Business 1 obtained quotes from three vendors for the same services after discovery of Green's fraud. *Id.* ¶ 12. These quotes showed that Contractor 1 charged far above the market rate for the primary apartment turnover services of cleaning and painting a vacated apartment, resulting in losses of $18,150 from overbilling. *Id.* ¶¶ 12-13.

During the same period Green submitted invoices to Business 1 for $100,988 in fraudulent charges from Contractor 1, Contractor 1 transferred $29,711.40—split over 18 payments—to Green's personal bank account. *Id.* ¶ 14.

<u>Non-Financial Harm</u>. As noted in the Victim Impact Statement, Green's scheme leads to "incalculable harm" beyond financial loss. *See* Ex. D. Business 1 managed a property owned by another company; Green's actions "forever altered" Business 1's relationship with the property owner. By the nature of Green's position, she was entrusted with confidential information about

5

the property's residents, their bank accounts, and Business 1's bank accounts. She used this confidential information about others for her own gain. *Id.*

### B.  *Green's Use of Proceeds to Fund Luxury Lifestyle*

Green applied the proceeds from her fraud to enrich her life and support her luxury lifestyle. Plea at 11. From the proceeds of her fraud, Green converted $108,808 to cash or her personal bank accounts, paid one family member $12,010, spent $4,483 on airline tickets, bought $5,326.98 of Washington Wizards and other event tickets, purchased $6,900 in goods from luxury retailers, and helped finance her Audi. Ex. F (Spending Chart).

## II.  GUIDELINES CALCULATIONS

The United States agrees with the guidelines computation in the plea agreement and Pre-Sentence Report setting the final adjusted offense level at 18. The base offense level is 7. *See* U.S.S.G. § 2B1.1(a)(1). A 12-level increase applies, because the loss amount is greater than $250,000 but not more than $550,000. *Id.* § 2B1.1(b)(1)(J). Within this range, the loss amount of $386,691 is near the midpoint of $400,000. A 2-level increase applies, because the defendant abused a position of trust in a manner that significantly facilitated the commission or concealment of the offense. *Id.* § 2B1.1(b)(10)(C). A 3-level reduction applies for acceptance of responsibility. Based on all applicable increases and reductions, the final adjusted offense level is 18. The guidelines range resulting from a criminal history category of I is 27 to 33 months.

## III.  SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

Based on the factors set forth in 18 U.S.C. § 3553(a), a sentence of 30 months, the middle of the guidelines range, is sufficient but not more than necessary to achieve the purposes of sentencing. During sentencing, the Court must calculate the sentence range recommended by the Sentencing Guidelines and consider the sentencing factors in 18 U.S.C. § 3553(a). *See, e.g.*, *United States v. Green,* 436 F.3d 449, 455-56 (4th Cir. 2006). The Court should explain any departure

from the guidelines range; "reasons for not applying the properly calculated Guideline range must be based on the factors listed in § 3553(a)." *Id.* at 456. Here, a sentence of 30 months appropriately balances the § 3553(a) factors, particularly the nature and circumstances of the offense, the purposes of sentencing including punishment and deterrence, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to the victim of Green's fraud scheme.

> A. *The Nature and Circumstances of Green's Scheme—Consisting of a Pattern of Deception, Enlistment of Others to Perpetrate Her Fraud, and Abuse of a Position of Trust —Merit a Guidelines Sentence*

The nature of Green's conduct warrants a guidelines sentence based on her pattern of deception and concealment, enlistment of others in her crimes, and abuse of a position of trust.

Green engaged in a pattern of deception that she took extensive steps to conceal. She created and registered a shell company and opened a bank account in its name. She forged a W-9 form to get EPS set up in Business 1's vendor payment system. She then repeatedly submitted fake invoices over a 15-month period from the shell company and submitted them to Business 1, resulting in 45 different payments. While running the EPS scheme, Green also found time to create fake invoices from other actual area businesses that were fake. None of these business provided services to Business 1. While using her work time to operated multiple sophisticated fraud schemes, Green continued to draw a large salary from Business 1 for purportedly acting as a steward of Business 1's finances.

The nature of her conduct is more serious by Green's enlistment of other family members and personal connections to further enrich herself. At Green's inducement, her close family members lied about their identities on their leases and in communications with other tenants. The regularity of payments from Contractor 1 to Green—during the time that Green ensured that Contractor 1 received the work—provides evidence of apparent kickbacks to Green in exchange for steering work to Contractor 1. Green appears to have colluded with Individual 1, Contractor

7

1's owner, to award him apartment turnover services in exchange for these apparent kickbacks. She then used profits—those stemming from these apparent kickbacks and the reimbursements from many fake invoices—for the benefit of herself and the others she enlisted: she took a luxury vacation to Cancun with Individual 1, paid a family members who received reduced rent $12,010 out of the payments to EPS, and bought herself Washington Wizards tickets and designer goods.

To effectuate her scheme, Green systematically abused the trust of her employer. Business 1 relied on Green to service clients, to handle confidential information and company finances, and to treat all apartment tenants in an honest manner. Before Green's fraud was discovered, Business 1 allowed her position to operate with a high degree of trust. Business 1 assumed her good faith in routine actions such as purchasing gift cards for residents, making small purchases for the benefits of residents, or setting lease terms to keep units occupied, and thus did not require extensive recordkeeping in these areas. This abuse of trust alone merits a guidelines sentence in this matter.

> B. *A Serious Sentence is Needed to Provide Just Punishment and Achieve Deterrence Based on the Size of the Fraud and Green's Actions After Discovery of the Fraud*

A sentence in the middle of guidelines range also accomplishes the sentencing purposes of providing just punishment and adequate deterrence. The sentence should reflect the need to punish a fraud scheme built on careful planning and layers of deception. Green created a fictitious business before repeatedly drafting and submitting fictitious invoices. Green is certainly not a defendant who stumbled into a one-time mistake, but rather created an elaborate deception that she maintained over fifteen months. A lengthy sentence is also needed to provide just punishment for Green's actions after discovery of the fraud. When Business 1 confronted her about her fraud and terminated her employment, Business 1 reported that she continued to deny responsibility while also seeking reimbursement for expenses that she knew to be fraudulent. This choice to evade rather than admit responsibility is a factor the Court should consider at sentencing.

The recommended sentence also advances the purpose of deterrence. As to general deterrence, fraud prosecutions like this one require substantial investigative resources to prosecute. Due to the resources required to mount such a prosecution, and the difficulty—as evidenced in this case—of calculating or obtaining restitution for the total amount when a fraudster takes deliberate actions to conceal, general deterrence becomes a more important sentencing factor. The need for specific deterrence also is stronger for a fraud such as Green's that inducts others into her schme. A serious sentence is needed to send a message to Green about the costs of enlisting others to join in her criminal activity. At the same time, it sends a message to Contractor 1's owner, Green's relatives, and similarly situated individuals to reconsider the effect that joining the organizer of a scheme to defraud will have before joining the scheme.

      C.    *Because the Defendant's Characteristics are Similar to Defendants in Other Fraud Cases, a Guidelines Sentence Avoids Unwarranted Sentencing Disparities*

A guidelines sentence avoids unwarranted sentence disparities among similar defendants. In FY 2019, of the 76,538 cases proceeding to sentencing nationwide, only 5,707 of them involved theft or fraud. *See* U.S. Sentencing Comm'n Quick Facts: Theft, Property Destruction and Fraud Offenses (2020).[3] In these cases, the median loss amount was just $137,500; 52% involved loss amounts of $150,000 or less. *Id.* Over 69% of the defendants had little to no criminal history at the time of sentencing. *Id.* Of these defendants, 70.5% were sentenced within the guidelines range.

Green is similar to the average defendant in a fraud case. In this type of case, the lack of criminal history is a factor that makes the fraud possible by allowing Green to hold the position of trust she did, rather than a mitigating factor. With over $386,000 in actual losses, her fraud resulted in well above the median loss value. The amount of loss she caused is near the midpoint for her

---

[3] *Available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Theft_Property_Destruction_Fraud_FY19.pdf.

+12 guidelines enhancement. Any departure from a guidelines sentence in these circumstances would result in a disparity as to defendants in similar cases.

       D.    *The Court Should Order Restitution of the $386,691.09 in Actual Losses Caused to Business 1 as a Result of Defendant's Scheme to Defraud*

Pursuant the parties' plea agreement, the defendant has agreed to the entry of a restitution judgment for the full amount of the victims' losses. The parties stipulated in the plea agreement the amount of loss is "at least" $285,703.09. Plea at 7, 11. The United States has now calculated the full amount of the Business 1's losses as $386,691.09. This amount includes the amounts agreed to in the plea agreement and a conservative fair market value of Contractor 1's services, using the highest quote from multiple vendors rather than the median or lowest value. *See United States v. Steele*, 897 F.3d 606, 611 (4th Cir. 2018) (explaining that "the fair market value generally provides the best measure of value to satisfy the [Mandatory Victims Restitution Act]."). Although Business 1 calculated higher out-of-pocket expenses of $660,000,[4] the United States excluded expenses where recordkeeping or the nature of the expense made the fair market value of the loss to Business 1 too uncertain. Thus, the United States requests that the Court order restitution for the $386,691.09 in actual losses sustained by the victim, pursuant to the plea agreement.

**IV.**    **FORFEITURE**

As part of the plea agreement, Green agreed to the Court's entry of an order of forfeiture including a forfeiture money judgment of at least $246,179.09 in U.S. currency representing the net proceeds that Green obtained as a result of the scheme to defraud. The United States has filed a motion for a preliminary order of forfeiture to include the agreed-upon money judgment in the amount of $246,179.09. ECF 50. Green further agreed that, due to his acts or omissions, the

---

[4] For Business 1's itemized calculation of losses, *see* Ex. E at 5 (itemizing Business 1's calculation of losses).

10

proceeds of his offense are not currently available for forfeiture, and accordingly, the government is entitled to the forfeiture of substitute assets, should any subsequently be identified, because one or more of the conditions of 21 U.S.C. § 853(p) have been met.

## V.　CONCLUSION

For the foregoing reasons, and based on a balancing of the applicable factors set out in 18 U.S.C. § 3553(a), the United States requests that this Court sentence Green to 30 months of imprisonment, followed by three years of supervised release, find that the actual losses to Business 1 under the guidelines total $386,691.09, and enter an order of restitution for this full amount of actual losses.

Respectfully submitted,

Jonathan F. Lenzner
Acting United States Attorney

By:　/s/_____
　　　Craig G. Fansler
　　　Special Assistant United States Attorney

　　　Dana Brusca
　　　Assistant United States Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was electronically through the Court's electronic filing system and thus served on all parties.

/s/ Craig G. Fansler<br>
Craig G. Fansler<br>
Special Assistant United States Attorney